Point Properties, Inc., which owns beach-front property in the Town of Dauphin *Page 1334 
Island, sued the town's mayor, Doris Anderson, in her individual capacity; the town's building inspector, Leroy Coulter, in his individual capacity; the town's police chief, Terry Beasley, in his individual capacity; and the members of the town's council, Billy Patronas, Jim Boone, Georgia Mallon, Jeff Collier, and Claude Brown, in their individual capacities, alleging that the defendants had conspired to deprive it of the use and enjoyment of its property without due process of law. Point Properties sought to recover both compensatory and punitive damages under 42 U.S.C. § 1983. The defendants moved for a summary judgment, raising the defenses of absolute and qualified immunity. The trial court granted their motion, and Point Properties appealed. We affirm in part, reverse in part, and remand.
The summary judgment was proper in this case if there was no genuine issue of material fact and the defendants were entitled to a judgment as a matter of law. Rule 56, Ala.R.Civ.P. The burden was on the defendants to make a prima facie showing that no genuine issue of material fact existed and that they were entitled to a judgment as a matter of law. If that showing was made, then the burden shifted to Point Properties to present evidence creating a genuine issue of material fact, so as to avoid the entry of a judgment against it. In determining whether there was a genuine issue of material fact, we must view the evidence in the light most favorable to Point Properties and must resolve all reasonable doubts against the defendants. Knight v. Alabama Power Co.,580 So.2d 576 (Ala. 1991). Because this case was not pending on June 11, 1987, the applicable standard of review is the "substantial evidence" rule. Ala. Code 1975, § 12-21-12. "Substantial evidence" has been defined as "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida,547 So.2d 870, 871 (Ala. 1989).
The evidence, viewed in the light most favorable to Point Properties, shows that Point Properties, in a move designed to clear the way for it to develop its beach-front property, sought, and received, the consent of the Dauphin Island Property Owners Association ("the Association") to vacate a paved, public roadway known as Pirate's Cove Street, which divided the property owned by Point Properties and provided access to the beach from Bienville Boulevard. The roadway was subsequently vacated and became the property of Point Properties. Doris Anderson was the president of the Association at the time the roadway was vacated. When the Town of Dauphin Island was later incorporated, Anderson became its mayor. Thereafter, responding to numerous complaints from nearby property owners that trespassers were using the vacated roadway as a means of ingress to and egress from the beach and that the trespassing had become a nuisance, Point Properties agreed to excavate the roadway so that it could not be used. However, when Point Properties began making plans to excavate the roadway, its attorney, Norton Brooker, was informed by Anderson that Point Properties was taking too much time to begin the development of its property. She told Brooker that she and the town's council "wanted the street back" because Point Properties "had not built a hotel" on its property. Anderson also told Brooker that she and the council "had decided that claiming the street would be a way to put pressure on Point Properties to 'do something.' " When Brooker later contacted the town's attorney to ascertain on what basis Anderson and the council were claiming the roadway, Brooker was told that the town had considered "the idea of condemning the former street in order to get it back, but [that the town] simply did not have the money to do so, and for that reason [the town was] pursuing the question of the validity of the vacation."[1] The official *Page 1335 
minutes of one of the council's meetings reflect that the members of the council adopted a resolution stating that the roadway should not be excavated until the question of its ownership could be resolved:
 "Mayor Anderson advised that since Pirate's Cover Street has been vacated to Point Properties, Inc., there have been many complaints of the use of the street, the use of the adjoining areas and the litter left by those using the street. Town attorney . . . took the floor to state that the Mobile County Commission vacated the street in 1987, but it now appears that the vacation may have been improper because of a 1980 Alabama Supreme Court ruling which held that a similar [vacation] of a street was improper since it required but did not receive approval of all the property owners of the subdivision. [The town's attorney] recommended that the Town Council impede the destruction of the street, as is currently planned by Point Properties, and attempt to get the street back into the control of the Town of Dauphin Island which is the successor to Mobile County.
 "It was moved by Alderman Collier, seconded by Alderman Mallon and unanimously approved by voice vote to have the town attorney advise the legal counsel of Point Properties that the ownership of the street is in doubt and request that they withhold any action on destruction of the street pending resolution of ownership — that the town attorney further advise the counsel of Point Properties and their construction company that action to destroy the street at this time is not desired."
Representatives of Point Properties were later denied a permit by Coulter to excavate the roadway and were advised by the town's attorney, Coulter, and Beasley that any attempt to excavate the roadway could result in the arrest of the persons involved. After all attempts to resolve the problem had failed, Point Properties filed suit.
The sole issue presented in this case is whether the defendants were entitled to a judgment as a matter of law based on the defenses of absolute or qualified immunity. The defendants contend that they prevented Point Properties from excavating the roadway because, they say, a valid question existed as to whether the roadway had been legally vacated. They argue that because they were under a duty, as representatives of the Town of Dauphin Island, to prevent the unlawful destruction of the public's property, they were clothed with immunity when they undertook to prevent Point Properties from excavating the roadway. Point Properties contends, however, that the defendants had no legitimate basis upon which to question the ownership of the roadway. It argues that a fact question precluding summary judgment was presented as to whether the defendants acted out of a genuine concern that the public's property was about to be destroyed or, instead, out of dissatisfaction with its development schedule. Point Properties maintains that, under the circumstances of this case, the defendants were not entitled to a judgment as a matter of law based on the defenses of absolute or qualified immunity.
Section 1983 provides a remedy for persons alleging deprivations of their constitutional *Page 1336 
rights by government officials through action taken "under color of state law." Notwithstanding the unqualified nature of its language, however, § 1983 was not intended to abrogate the common law immunities enjoyed by persons performing certain governmental functions. Owen v. City of Independence,445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980). It is now well settled that government officials performing legislative functions at the state level are entitled to absolute immunity from suits for damages under § 1983. Tenney v. Brandhove,341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951); Harlow v.Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396
(1982). State legislators "require this protection to shield them from undue interference with their duties and from potentially disabling threats of liability." 457 U.S. at 806,102 S.Ct. at 2732. Likewise, in Lake Country Estates, Inc. v.Tahoe Regional Planning Agency, 440 U.S. 391, 99 S.Ct. 1171,59 L.Ed.2d 401 (1979), the United States Supreme Court held that the members of a "regional" land planning agency performing legislative functions were entitled to absolute immunity from the plaintiff's § 1983 action and, although expressly reserving the question for a later date, strongly suggested that government officials performing legislative functions at the municipal level are also entitled to absolute immunity from § 1983 claims. Shortly after the Supreme Court decided LakeCountry Estates, the Eighth Circuit Court of Appeals held inGorman Towers, Inc. v. Bogoslavsky, 626 F.2d 607 (8th Cir. 1980), that government officials performing legislative functions at the municipal level are entitled to absolute immunity. The Court of Appeals stated in part:
 "The official immunity question in this case is whether the city directors were absolutely immune with respect to their enactment of the allegedly unconstitutional zoning amendment. Building upon the district court's holding that the directors' rezoning was a legislative act we begin with the proposition that state and regional legislators have an absolute federal common law immunity from liability for damages occasioned by their legislative acts, an immunity which Congress left undisturbed with its passage of the civil rights provision now codified at 42 U.S.C. § 1983. Lake Country Estates, Inc. v. Tahoe Regional Planning Agency, 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401
(1979) (absolute immunity for members of state-created regional land planning agency acting in legislative capacity); Tenney v. Brandhove, 341 U.S. 367, 376-78, 71 S.Ct. 783, 788-89, 95 L.Ed. 1019 (1951) (absolute immunity for state legislators). Cf. Supreme Court of Virginia v. Consumers Union, 446 U.S. 719, 100 S.Ct. 1967, 64 L.Ed.2d 641 (1980) (justices acting in legislative capacity have absolute immunity from injunctive and declaratory relief as well as from damages). Appellants seek to distinguish these cases and argue that absolute legislative immunity should not extend to the purely local level of government. . ..
 "In determining the breadth of federal common law immunities, the Supreme Court has accommodated two competing interests. The first, asserted by defendants, is the interest in having governmental officials exercise their judgment free of the fear of burdensome and potentially ruinous personal litigation. The second, asserted by plaintiffs, is the interest in checking improper official conduct and in providing wronged individuals with adequate remedies for their injuries. See, e.g., Butz v. Economou, 438 U.S. 478, 501-03, 98 S.Ct. 2894, 2907-09, 57 L.Ed.2d 895 (1978); Imbler v. Pachtman, [424 U.S. 409, 422-29, 96 S.Ct. 984, 991-94, 47 L.Ed.2d 128
(1976)]; Wood v. Strickland, 420 U.S. 308, 319-21, 95 S.Ct. 992, 999-1000, 43 L.Ed.2d 214 (1975); Scheuer v. Rhodes, 416 U.S. 232, 242-47, 94 S.Ct. 1683, 1689-92, 40 L.Ed.2d 90 (1974). See also Note, The Proper Scope of The Civil Rights Acts, 66 Harv.L.Rev. 1285, 1295 n. 54 (1953).
 "The Supreme Court emphasized the first of these interests in advancing a rationale for absolute legislative immunity in Tenney v. Brandhove: *Page 1337 
 " 'Legislators are immune from deterrents to the uninhibited discharge of their legislative duty, not for their private indulgence but for the public good. One must not expect uncommon courage even in legislators. The privilege would be of little value if they could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives.'
 "341 U.S. at 377, 71 S.Ct. at 788. With respect to this 'public good' rationale, we perceive no material distinction between the need for insulated legislative decision-making at the state or regional level and a corresponding need at the municipal level. Indeed, the nature of municipal government may make the need to quell a legislator's fear of personal retribution particularly compelling.
 " 'Because municipal legislators are closer to their constituents than either their state or federal counterparts, they are, perhaps, the most vulnerable to and least able to defend lawsuits caused by the passage of legislation. Particularly in the area of land use, where decisions may have an immediate quantifiable impact on both the value and development of property, local legislators should be free to act solely for the public good without the specter of personal liability with the passage of each zoning ordinance.'
"Ligon v. Maryland, 448 F. Supp. 935, 947 (D.Md. 1977)." 626 F.2d at 611-12. See, also, R. Freilich and R. Carlisle, Section1983: Sword and Shield (Civil Rights Violations: The Liabilityof Urban, State, and Local Government), 335-39 (1983); and C. Antieau, Federal Civil Rights Acts (Civil Practice) § 107 (2d ed. 1980) (indicating that there is a split of opinion among the various courts as to whether absolute immunity should be extended to government officials performing legislative functions at the municipal level). In Tutwiler Drug Co. v. Cityof Birmingham, 418 So.2d 102, 106 (Ala. 1982), this Court expressly approved the rationale utilized by the Eighth Circuit Court of Appeals in extending absolute immunity to government officials performing legislative functions at the municipal level.
In the present case, only Anderson (the mayor) and the members of the town's council held positions that could have involved the performance of a legislative function. The most recent federal census indicates that the Town of Dauphin Island has a population of fewer than 900 inhabitants. Ala. Code 1975, § 11-43-2, provides, in pertinent part, as follows:
 "In all cities and towns having a population of less than 12,000 inhabitants according to the last or any subsequent federal census, the legislative functions shall be exercised by the mayor and five aldermen. The mayor shall preside over all deliberations of the council. At his discretion he may vote as a member of the council on any question coming to a vote, except in case of a tie, in which event he must vote."
A "legislative function" is generally defined as "[t]he determination of legislative policy and its formation as [a] rule of conduct." Black's Law Dictionary (6th ed. 1990). In a similar vein, "legislative power" is defined in Black's as "[t]he lawmaking powers of the legislative body, whose functions include the power to make, alter, amend and repeal laws." On the other hand, the "executive department" is defined in Black's as "[t]hat branch of government charged with carrying out the laws enacted by the legislature." An "executive officer" is "[a]n officer of the executive department of government . . . in whom resides the power to execute the laws." "Administrative acts" are defined as "[t]hose acts which are necessary to be done to carry out legislative policies and purposes already declared by the legislative body or such as are devolved upon it by the organic law." Black's. It is, as the defendants contend, within the power of any city or town to protect the public's right to the free and uninterrupted use of a public roadway. See, e.g.,McCraney v. City of Leeds, 241 Ala. 198, 1 So.2d 894 (1941). However, the actual exercise of *Page 1338 
that power in preventing the destruction of a public roadway is in the nature of an executive or administrative function of municipal government. Although it is true, as the defendants point out, that the members of the council passed a resolution stating that the roadway should not be excavated until the question of its ownership could be resolved, that resolution, albeit a formal expression of the council's position on the matter, was not legislative in nature. At best, the resolution was a directive by the council to Anderson, Coulter, and Beasley to implement the law by performing their discretionary functions with an eye toward preventing the excavation of what was perceived to be a public roadway.[2] Accordingly, Anderson and the members of the town's council were not entitled to a judgment as a matter of law based on the defense of absolute immunity.
Although absolute immunity from § 1983 actions is available to government officials performing legislative functions at the municipal level, generally only qualified or "good faith" immunity has been extended to government officials performing discretionary functions that are characteristically executive or administrative. Scheuer v. Rhodes, 416 U.S. 232,94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); Harlow, supra; Mitchell v. Forsyth,472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). See, also,Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034,97 L.Ed.2d 523 (1987); Section 1983: Sword and Shield, supra, at 340-42; and Federal Civil Rights Acts, supra, §§ 108, 109. Consequently, because the United States Supreme Court has applied a "function" test in determining the extent of immunity granted to government officials, and because that Court has strongly suggested, and other courts have held, that government officials performing at the municipal level should not be classified differently from government officials performing at the federal or state level, we conclude that immunity is available to government officials performing discretionary functions at the municipal level that are executive or administrative in nature, but that that immunity is limited to the qualified or "good faith" variety.
The Eleventh Circuit Court of Appeals has set out the standard by which the propriety of a summary judgment based on the qualified immunity defense should be determined:
 "The Supreme Court, in Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396
(1982), established the following test for determining whether a public official can claim qualified immunity: '[G]overnment officials . . . generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' Courts evaluate the officials' conduct under an objective, reasonable person standard; the relevant question on a motion for summary judgment based on a defense of qualified immunity is whether a reasonable official could have believed his or her actions were lawful in light of clearly established law and the information possessed by the official at the time *Page 1339 
the conduct occurred. Anderson v. Creighton, 483 U.S. 635, 642, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523
(1987); Herren v. Bowyer, 850 F.2d 1543, 1545-46
(11th Cir. 1988). Thus, the qualified immunity defense provides ample protection to all except the plainly incompetent or those who knowingly violate the law. Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).
 "This familiar standard presents two distinct questions of law for this court to consider in determining whether the district court erred in refusing to grant summary judgment. First, we must determine whether the legal norms allegedly violated by the defendants were clearly established at the time the defendants acted. Rich v. Dollar, 841 F.2d 1558, 1564 (11th Cir. 1988).* If the law that the defendants allegedly violated was not clearly established, then the defendants are entitled to qualified immunity. See Daniel v. Taylor, 808 F.2d 1401, 1403 (11th Cir. 1986) (holding that to be entitled to qualified immunity, defendants need only show that it is an unsettled question of law whether plaintiff had a right not to be detained without probable cause).
 "If the legal norms that the defendants are alleged to have violated were clearly established when the defendants' conduct occurred, then we must proceed to the second question of law in our analysis: whether the plaintiff has adduced evidence sufficient to create a genuine issue of fact as to whether the defendant engaged in conduct violative of the rights guaranteed by the clearly established law. Bennett v. Parker, 898 F.2d 1530, 1532-33 (11th Cir. 1990); Rich, 841 F.2d at 1564."
Stewart v. Baldwin County Board of Education, 908 F.2d 1499,1503 (11th Cir. 1990).
Applying the standard set out in Stewart, we also conclude that Anderson and the members of the town's council were not entitled to a judgment as a matter of law based on the defense of qualified immunity. Although evidence was presented tending to show that they were acting within the scope of their discretionary authority when the allegedly wrongful acts occurred, the "legal norm" allegedly violated by these defendants was clearly established at the time they acted. InAnderson, supra, the Supreme Court stated that the appropriate inquiry in determining whether a defendant's actions violated clearly established constitutional rights is particularized and fact-specific; a generalized allegation of an abstract right is not sufficient. The Court of Appeals in Stewart, supra, noted:
 "An official will be immune from liability if the applicable law was unclear or if a reasonable officer could have believed that his actions were lawful in light of the clearly established law and the information possessed by the officer. McDaniel v. Woodard, 886 F.2d 311, 314 (11th Cir. 1989). Although the standard is fact-specific, it is not one of factual rigidity. The very conduct in question need not have been explicitly held to be unlawful prior to the time the official acted; rather, 'in light of the preexisting law the unlawfulness must be apparent.' Anderson v. Creighton, 483 U.S. at 641, 107 S.Ct. at 3039. See also People of Three Mile Island v. Nuclear Regulatory Comm'rs, 747 F.2d 139, 144 (3rd Cir. 1984) ('Although officials need not "predic[t] the future course of constitutional law" . . . they are required to relate established law to analogous factual settings.') (citations omitted); Rakovich v. Wade, 850 F.2d 1180, 1209 (7th Cir. 1988) (en banc); Eastwood v. Dep't. of Corrections, 846 F.2d 627, 630 (10th Cir. 1988); Lappe v. Loeffelhoz, 815 F.2d 1173, 1177 (8th Cir. 1987)."
908 F.2d at 1504. The Fourteenth Amendment to the United States Constitution expressly *Page 1340 
prohibits the deprivation of property without due process of law. Under Point Properties' version of the facts — that Anderson and the members of the council had no legitimate basis upon which to question the validity of the vacation of the roadway and that their purported reliance on their attorney's legal opinion was pre-textual — it is clear that reasonable government officials in the positions of these defendants would have known that any interference with the right of Point Properties to use and enjoy its property was a clear violation of constitutional law.[3] Furthermore, the record shows that a genuine issue of fact existed as to whether Anderson and the members of the council actually engaged in conduct violative of Point Properties' constitutional right to the use and enjoyment of its property. Anderson and the members of the council contend that their actions were motivated solely by their sense of duty to preserve the public's property, and there is evidence to support their contention. Point Properties insists, however, that the actions of Anderson and the members of the council were motivated, instead, by their desire to coerce it into developing its property, and Brooker's affidavit supports its contention. Suffice it to say that, viewing the evidence in the light most favorable to Point Properties, as our standard of review requires us to view it, we cannot say, as a matter of law, that Anderson and the members of the town's council did not violate Point Properties' clearly established constitutional right to the uninterrupted use and enjoyment of its property.
However, we can say that the summary judgment for Coulter, the building inspector, and Beasley, the police chief, was proper. These defendants made a prima facie showing that their discretionary actions were motivated by a sense of duty to protect the public's property, and Point Properties presented no evidence tending to rebut that prima facie showing. For all that appears in the record, Coulter and Beasley acted to prevent the excavation of the roadway solely on the basis of the council's resolution. No evidence was presented tending to show that either Coulter or Beasley was a party to any conspiracy to unlawfully interfere with the property rights of Point Properties.
For the foregoing reasons, the summary judgment is affirmed as to Coulter and Beasley; however, as to Anderson and the members of the town's council, it is reversed; and the case is remanded for further proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
HORNSBY, C.J., and MADDOX, SHORES and INGRAM, JJ., concur.
[1] Brooker's affidavit, submitted by Point Properties in opposition to the motion for summary judgment, reads, in pertinent part, as follows:
 "On May 9, 1989, I attended a meeting of the Planning Commission [, which] was then considering certain amendments to the zoning requirements for the Island. At this time, Mrs. Anderson, who . . . was the Mayor of Dauphin Island, Alabama, told me in the presence of Mr. Walt Yerkes that 'they' (meaning the Town Council) wanted the street back (meaning the vacated portion of Pirate's Cove Street) inasmuch as [Point Properties] had not built a hotel. Mrs. Anderson acknowledged to me during that discussion that [Point Properties] had never made any commitment, either orally or otherwise, as to when the development would begin, but that 'they' had decided that claiming the street would be a way to put pressure on Point Properties to 'do something' and that was the reason they were taking the position that they wanted the street back. . . . At no time did Mrs. Anderson raise or discuss with me any question concerning the validity of the vacation of Pirate's Cove Street south of Bienville Boulevard.
 "Subsequent to that meeting, I called [the town's attorney] on or about May 16, 1989, in order to ascertain [on] what basis the 'Town' was claiming the street. [The town's attorney] advised me that the Town had considered the idea of condemning the former street in order to get it back, but they simply did not have the money to do so, and for that reason they were now pursuing the question of the validity of the vacation."
[2] In Smith v. Arnold, 564 So.2d 873, 876 (Ala. 1990), this Court discussed the difference between ministerial and discretionary functions:
 "Comment h. to § 895D, Restatement (Second) of Torts (1979), describes 'ministerial acts' as those involving '[l]ess in the way of personal decision or judgment or [in which] the matter for which judgment is required has little bearing of importance upon the validity of the act,' and states that '[m]inisterial acts are those done by officers and employees who are required to carry out the orders of others or to administer a law with little choice as to when, where, how, or under what circumstances their acts are to be done.' Conversely, 'discretionary acts' are defined as follows by Black's Law Dictionary 419 (5th ed. 1979): 'Those acts [as to which] there is no hard and fast rule as to [the] course of conduct that one must or must not take and, if there is [a] clearly defined rule, such would eliminate discretion. . . . One which requires exercise in judgment and choice and involves what is just and proper under the circumstances.' "
Fulfilling the responsibilities of a municipal building inspector and police chief requires daily decision making and the exercise of good judgment under varying circumstances; accordingly, contrary to the contention of Point Properties, we do not view the positions of Coulter and Beasley as involving the performance of ministerial functions.
* "Rich, 841 F.2d at 1563-64 (citing Zeigler v. Jackson,716 F.2d 847, 849 (11th Cir. 1983), sets out a two-step framework for applying Harlow's objective reasonableness test. In the first step, the defendants must prove they were acting within the scope of their discretionary authority when the allegedly wrongful acts occurred. The second step then shifts the burden to the plaintiff to show that the defendants' actions violated clearly established constitutional law. . . ."
[3] We emphasize once again that our standard of review requires us to view the evidence in this case in the light most favorable to Point Properties. Viewing the evidence in that light, we must assume that the roadway in question was legally vacated, as Point Properties claims. Whether the roadway was, in fact, legally vacated and, if it was not, whether Point Properties would lack standing to maintain an action under § 1983, are issues not properly before us on this appeal.